UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MARGERE MORGAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:11-CV-1746 (CEJ) |
| ) | |
| HAWTHORNE CHILDREN'S ) | |
| PSYCHIATRIC HOSPITAL, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM AND ORDER

This matter is before the Court on defendant's motion for summary judgment. Plaintiff opposes the motion, and the issues are fully briefed.

I. Background

Plaintiff Margere Morgan began working at defendant Hawthorne Children's Psychiatric Hospital as Psychiatric Aide I (PA-I) in 1999. Defendant provides care and residential services to emotionally disturbed or mentally disabled children ages 6 through 18. As a PA-I, plaintiff supervised and cared for the children.

In 2002, plaintiff was diagnosed with pulmonary fibrosis, a lung disease that leads to shortness of breath, fatigue, and chest discomfort. Plaintiff's disease progressed and, starting in February 2008, plaintiff brought a soft-shelled oxygen unit to work in case of unpredictable "flare-ups" of the disease. In March 2008, plaintiff applied for intermittent leave under the Family and Medical Leave Act (FMLA). On her application, her treating physician, Dr. Neil Ettinger, M.D., wrote that plaintiff may have to work intermittently during "flare-ups" that are difficult to predict and may occur "0 - 3 days per month." Def. Ex. E [Doc. #66-5]. Plaintiff's application was approved on March 17, 2008, allowing her one to three days of leave per month as needed. Id.

On July 23, 2008, defendant's Chief Operating Officer, Marcia Ford, learned that plaintiff was bringing an oxygen unit to work. Ford examined the oxygen unit and observed that it contained tubing. Concerned that patients might use the tubing to injure themselves or others, Ford told plaintiff to go home on leave while Ford and others determined whether the oxygen unit could be allowed in the facility. Plaintiff suggested that she could leave the oxygen locked in a staff area, and Ford told plaintiff to go home while defendant made a determination. Plaintiff then requested a desk job, and Dr. Ettinger sent a fax to Ford, stating that, "Ms. Morgan requires a desk job with minimal physical exertion." Def. Ex. H [Doc. # 66-8].

On August 7, 2008, the Director of Human Resources Donna Harris spoke with plaintiff over the phone. Harris explained that plaintiff was no longer qualified to work as a PA-I at Hawthorne, and no desk jobs were available. Harris told plaintiff that her options were to apply for long-term disability insurance, or to resign and apply for jobs at other state agencies. Def. Ex. I [Doc. #66-9]. Harris then mailed a partially completed copy of the application for long-term disability insurance to plaintiff, and on August 31, 2008, plaintiff completed the remainder of the application and sent it to the Standard Insurance Company. Def. Ex. J [Doc. #66-10]. Plaintiff's application was approved, and on October 10, 2008, Ford wrote a letter to plaintiff, stating that, due to the approval of long-term disability insurance, plaintiff was deemed to have voluntarily resigned in good standing. Def. Ex. M [Doc. #66-13].

Plaintiff obtained a right to sue letter from the Equal Employment Opportunity Commission (EEOC), and filed the instant case thereafter, alleging violations of the Americans with Disabilities Act (ADA) of 1990, as amended, 42 U.S.C. §§12101, *et seq.* and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §701, *et seq.*

## II. Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. United of Omaha Life Ins. Co. v. Honea, 458 F.3d 788, 791 (8th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III. Discussion

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. §12112(a). In the absence of evidence of direct discrimination, ADA claims of discriminatory disparate treatment are analyzed under the traditional burden-shifting framework of McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973). See Feeney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 711-12 (8th Cir. 2003). The McDonnell Douglas analysis is "aimed at fleshing out [the] 'elusive factual question of intentional discrimination.'" Peebles v. Potter, 354 F.3d 761, 766 (8th Cir. 2004) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)). First, plaintiff must establish a prima facie case, demonstrating that she "(1) had a disability within the meaning of the ADA; (2) was qualified, with or without a reasonable accommodation, to perform the essential job functions of the position in question; and (3) suffered an adverse employment action because of [her] disability." Lors v. Dean, 595 F.3d 831, 834 (8th Cir. 2010) (quoting Rehrs v. Iams Co., 486 F.3d 353, 356 (8th Cir. 2007)). "The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's actions." Id. "If the employer articulates such a reason, the burden returns to the employee to show the employer's justification is a pretext." Id.

The ADA also establishes an affirmative duty for employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship...." 42 U.S.C. §12112(b)(5)(A). The McDonnell Douglas standard does not apply to "reasonable accommodation" claims, "because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive." Peebles, 354 F.3d at 766. Instead, a modified burden-shifting analysis applies. See Feeney, 327 F.3d at 712 (citing Benson v. Nw. Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995)); Mason v. Frank, 32 F.3d 315, 318-19 (8th Cir. 1994) (applying the same analysis under the Rehabilitation Act). Under

the modified analysis, plaintiff must show that she has a disability and that she suffered adverse employment action. Feeney, 327 F.3d at 712. Then, she must show that she is a "qualified individual," meaning that she possesses the skill, education, experience, and training for her position, and that she is able to perform the essential job functions, with or without reasonable accommodation. If the employee required an accommodation to perform the essential functions of the job, she must make a facial showing that a reasonable accommodation was possible. The burden then shifts to her employer to show that it is unable to accommodate the employee. Id.

As to plaintiff's claims under the Rehabilitation Act, "[t]he ADA and section 504 of the Rehabilitation Act are 'similar in substance' and, with the exception of the Rehabilitation Act's federal funding requirement, 'cases interpreting either are applicable and interchangeable' for analytical purposes." Bahl v. Cnty. of Ramsey, 695 F.3d 778, 783 (8th Cir. 2012) (quoting Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999)).

In this case, plaintiff appears to raise both disparate treatment and reasonable accommodation claims. Defendant argues that it is entitled to summary judgment because plaintiff cannot establish a prima facie case under the ADA or the Rehabilitation Act. For the purpose of this motion, defendant does not contest that plaintiff is disabled within the meaning of the ADA, but asserts that plaintiff cannot show that she was qualified to perform the essential functions of her position. Defendant argues that the accommodations requested by plaintiff were unreasonable and unduly burdensome. Defendant also contends that there was a legitimate, non-discriminatory reason for plaintiff's termination.

A. Qualified to Perform Essential Functions

"Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. §1630.2(n)(1). Evidence of whether a particular function is essential includes:

> (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. §1630.2(n)(3). Defendant considers restraining patients to be an essential function of the PA-I position. The PA-I job description identifies at least 20% of a PA-I's time as spent performing "[i]ntervention, verbal or physical, when patients become agitated, hostile or dangerous to self or others to prevent and manage self-destructive or assaultive behavior using the appropriate crises intervention techniques…" Def. Ex. B. [Doc. #66-2; p. 2]. In her letter to plaintiff, Harris explained that "essential functions" of the PA-I job include "restrain[ing] clients, provid[ing] CPR or basic first aid to clients in emergency situations, escort[ing] clients as assigned, and participat[ing] in group/individual client activities." Def. Ex. I [Doc. #66-9]. Plaintiff does not contest that these functions were essential to her job. Instead, she argues that she could have performed these tasks if allowed reasonable accommodation.

B. Reasonable Accommodations

The ADA defines "reasonable accommodation" as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations…." 42 U.S.C. §12111(9)(B). "In

cases where the employee claims that [she] is able to perform the essential functions of the job with a reasonable accommodation, the employee must only make a facial showing that a reasonable accommodation is possible." Brannon v. Luco Mop Co., 521 F.3d 843, 848 (8th Cir. 2008) (citations and internal quotation marks omitted). "If an employee satisfies the facial showing, the burden 'shifts to the employer to show that it is unable to accommodate the employee.'" Gregor v. Polar Semiconductor, Inc., No. 11-3306 (DSD/TNL), 2013 WL 588743, at *4 (D.Minn. Feb. 13, 2013) (quoting Fenney, 327 F.3d at 712. "Whether a reasonable accommodation exists is often a fact question to be decided by the jury." Id. (citing EEOC v. Convergys Customer Mgmt. Grp., Inc., 491 F.3d 790, 796 (8th Cir. 2007)).

Plaintiff requested three alternative accommodations: (1) to carry her portable oxygen unit with her, (2) to leave her oxygen unit in a staff area at Hawthorne, to be accessed during an emergency, or (3) to be transferred to a desk position. Plaintiff has produced sufficient evidence that the first two accommodations she sought were both reasonable and possible. Plaintiff brought her oxygen unit to work from February through July of 2008, and there is no suggestion that she was unable to perform the essential functions of her job during that time. Defendant argues that the tubing on the unit would pose a danger to patients. However, defendant's official policy allows "[i]tems with cords, such as radios, clocks, tape players, Walkmen radios, curling irons, [and] reading lamps..." in residential areas. Pl. Ex. 3 [Doc. #67-3]. Furthermore, defendant has produced no evidence regarding the length or strength of the tubing of plaintiff's oxygen unit.

Plaintiff has also produced sufficient evidence that she could have left her oxygen tank in a secure, non-patient area of the hospital. A former volunteer at

Hawthorne who required oxygen was allowed to leave his oxygen in a locked office. Ford Depo. [Doc. #72-1; p. 52]. Defendant argues that a similar accommodation for plaintiff would be unreasonable, because plaintiff must occasionally participate in the physical restraint of patients. The exertion of that restraint might trigger a "flare-up," requiring plaintiff to leave the patient to access her oxygen. Patients at Hawthorne are restrained by four employees at once, and the degree to which plaintiff's participation might aggravate her disease, causing her to leave the patient to retrieve oxygen prior to the arrival of a nurse to sedate the patient, is an open question of fact.

Defendant contends that when plaintiff requested a desk job, she effectively "abandoned" her prior requests to bring her oxygen unit to work. Defendant has not cited to case law to support the proposition that, once an employee requests a lighter-duty accommodation, she is deemed to have abandoned her earlier, more moderate requests for other accommodations. Nor do the facts in this case suggest that plaintiff abandoned her request to bring her oxygen unit to work. Instead, plaintiff requested a desk job, and her physician faxed a request for a desk job, only after Ford expressed uncertainty about whether an oxygen unit could be allowed in the building and sent plaintiff home on leave.

C.  **Social Security Disability Application**

Defendant points to plaintiff's statements in her application for Social Security Disability Insurance (SSDI) as evidence that plaintiff is unable to work. The Supreme Court has held that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 797-98 (1999). "Nonetheless, an ADA plaintiff cannot simply

ignore her SSDI contention that she is too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job, at least with 'reasonable accommodation.'" Id. at 798.

Plaintiff has explained that her SSDI contention is consistent with her ADA claim, because she would have been able to work if accommodated with an oxygen unit. This explanation is supported by plaintiff's statements in her SSDI application that she stopped working because she was denied an accommodation. Def. Ex. N [Doc. #66-14] ("I couldn't do the things that I use [sic] to do and I couldn't have my oxygen on the Unit, so I could no longer work."). As the Supreme Court noted, "when the SSA determines whether an individual is disabled for SSDI purposes, it does *not* take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI." Id. at 803. Accordingly, the Court finds no inherent conflict between plaintiff's SSDI application and her ADA and Rehabilitation Act claims.

D.  Legitimate, Non-Discriminatory Reason for Termination

Defendant maintains that plaintiff cannot prevail on a claim of disability discrimination because there was a legitimate, non-discriminatory reason for plaintiff's termination: plaintiff's voluntary resignation when she was approved for long-term disability benefits.[1] Plaintiff's resignation is relevant to the issue of whether it was preceded by some adverse employment action taken by defendant. Neither party has addressed the issues of adverse employment action and constructive discharge.

---

[1] Under Missouri state regulations, "[a]n employee who applies and is approved by the applicable state benefit system for long-term disability or retirement status shall be deemed to have voluntarily resigned...." 1 Mo. CSR 20-3.070(6)(c). Accordingly, because plaintiff applied and was approved for long-term disability benefits, she is deemed to have resigned.

IV.  Conclusion

Because there is a genuine dispute of material fact as to whether plaintiff could perform the essential functions of her job with reasonable accommodation and as to whether plaintiff's disability could have been reasonably accommodated without undue hardship,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Doc. #64] is **denied**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 31st day of July, 2013.